ALBANY,
Feb. 1811.

MUMFORD *against* THE PHOENIX INSURANCE COMPANY.

MUMFORD
v.
PH. INS. Co.

THIS was an action on a policy of insurance, on goods on board of the ship *Victory*, from *New-York* to *Cher-bourg*, in *France*.

The cause was tried at the *New-York* sittings, in *June*, 1810, when a verdict was found for the plaintiff, subject to the opinion of the court on the following case, with liberty to either party to turn the same into a special verdict. The policy contained the usual printed clause, " warranted free from seizure for or on account of any illicit or prohibited trade."

The *Victory* sailed from *New-York* the beginning of *August*, 1807, with a cargo on board. The goods insured consisted of 225 barrels of potashes, and 30 tons of fustic, which were admitted to be *American* property belonging to the plaintiff, and of which he was the importer. On the 30th of *August*, 1807, while on her voyage, the *Victory* met with an *English* gun brig, which compelled her to go to *Plymouth*, her papers being taken by the master of the gun brig. She arrived in the outer road of *Plymouth* on the same day, and after being detained six hours, her papers were returned, and she was permitted to proceed on her voyage. During this detention, neither the master nor any of the crew went on shore, and the ship's papers were returned without any endorsement. The *Victory* arrived in the *Cherbourg* roads, on the 1st of *September*, 1807, and after the usual examinations of the officers of the customs and of the government, she was conducted by the pilot to the town of *Cherbourg*, where she arrived the 3d of *September*. The next day the master made a report of the ship and cargo, in the usual manner, but not receiving any permit to land the cargo, he remained, without breaking bulk,

*The margin note:*

A cargo was insured from *New-York* to *Cherbourg*, in *France;* and the policy contained a clause, " warranted free from seizure for or on account of any illicit or prohibited trade." The vessel met with an *English* cruiser, and was compelled to go into the outer road of *Plymouth*, where she was detained six hours, and then suffered to proceed, but no person belonging to the vessel went on shore during the time of her detention. The vessel and cargo arrived at *Cherbourg*, and were there seized under the *Berlin* decree, and confiscated, on the alleged ground that the captain, on his examination by one of the officers of the port, had made a *false* declaration, that he had not been in *England*. It was held, that this was not a loss arising from any illicit or prohibited trade; but under the general peril of " arrests and detainments of princes ;" and that the insurers were liable.

until the 7th or 8th of *September*.   On the 4th of *September* the master and two seamen made a report and entry of the ship at the custom-house, and the following declaration, which was entered in the custom-house register: " That the *Victory* was carried by an *English* man of war brig into the outer road of *Plymouth*, where she anchored for the space of six hours, after which time she was permitted to prosecute her voyage." The master also made his protest, in which he stated that his ship was leaky, and requested that the cargo might be discharged, as he feared it was damaged.   On the 7th of *September* the consignees of the plaintiff (the ship and residue of the cargo being put under sequestration) made the requisite declarations, entries and bonds at the custom-house, for the purpose of landing the goods; but the custom-house officer refused a permit to land them, unless the consignees should give their obligation and declaration that the same should remain in sequestration, at the custom-house, which obligation and declaration was accordingly given, before obtaining any permit to land. After obtaining such permit, the *potashes* and *fustic* were landed, under the inspection of the custom-house officers, and placed in the warehouses designated by government, where they were kept under the keys of the custom-house, in the possession of its officers.   The consignees had not the possession or disposal of the goods, at any time, nor any control over them; but from the time of their landing until they were condemned and sold, they remained sequestered, and under the keys of the custom-house.   The goods were not put under the custom-house keys by the consignees, for the purpose of enjoying the privilege of *entrepôt*, or any other facilities to the consignees; and the goods were free from duty, on importation into *France*.   A guard was placed on the ship, on the 7th of *September*, before the goods were landed, and after certain examinations and proceedings, the ship and cargo were, on the next day, declared to

be liable to seizure, and ordered to remain under seques- tration, until superior orders were received; and the necessary precautions were taken, on the part of the go- vernment, to secure the vessel and the cargo, including the goods insured, which were afterwards condemned by the *French* council of prizes.

The *procès verbal*, on which the decree of condemna- tion purported to be grounded, stated, that the director of the customs at *Cherbourg* having, on the 7th of *Sep- tember*, 1807, received a letter from the *director-general* of the customs, dated the 4th of *September*, informing that the emperor had decided, that the 7th and 8th arti- cles of the decree of the 21st of *November*, 1806, called the *Berlin* decree, should have a full and entire execu- tion, and that no vessel which should have touched in *England*, or should have been carried thither, should be admitted; and that the said director of the customs, having received information from one of the chief offi- cers of the customs, informing him that it appeared by the declaration of the captain of the *Victory*, and two of the crew, made at the custom-house, that the ship had touched in *England*, the director went to the principal commissary of marine, and having learned that in con- tempt of the 3d, 7th and 8th articles of the said decree, which were made known to the captain, in his own lan- guage, by one of the officers of the frigate *Stationaire*, the captain had declared that he did not come direct from *England*, nor from the *English* colonies, and had not been there since the 21st *November*, 1806, directed a guard, on the 7th of *September*, to be placed on the *Vic- tory*, which was accordingly done. That on the 8th of *September* an examination was had on board of the *Vic- tory*, by the proper officers of the government; and it was found by the ship's log-book, that she anchored in the outer road of *Plymouth*, on the 30th of *August*, 1807, where she was carried by an *English* brig; that the cap- tain had been on shore, and that the ship had left the

road of *Plymouth* on the 31st of *August*, and pursued her destination to *Cherbourg;* that during the examination of the log-book, the captain of the *Victory* went on deck and took from his pocket-book a paper, which he tore in pieces; that the pieces being put together, the paper was found to be a certificate of the *American* consul at *Plymouth*, purporting that the ship had been carried by an *English* armed brig into that port, and released to continue her voyage; that the master, mate and one of the marines were interrogated anew, and made the declaration which they had made at the custom-house. That the master being asked why he made a false declaration to the commandant of the frigate *Stationaire*, in affirming that he had not touched in *England*, he answered that he did not understand the question. That on being asked why he privately tore the certificate of the *American* consul, he answered, that he was astonished at the questions put to him, and was afraid lest it might injure him; that he was then informed that the ship and cargo were subject to seizure, in conformity to the 7th and 8th articles of the decree of the 21st *November*, 1806, for the single fact of his false declaration, but as to the cargo, part of which was already discharged and under the control of the custom-house, things should remain in the state they were until superior orders should be received; and necessary measures were taken, on the part of the government, to secure the ship and cargo.

The *procès verbal* was sent to the counsellor of state, and on the 20th of *September*, 1807, his letter was received, stating that there was a good cause of seizure of the ship and cargo, as *English* property, on the ground of a contravention of the 8th article of the *Berlin* decree.

The *procès verbal*, and other acts and documents, were transmitted to the council of prizes, who pronounced a decree, declaring the seizure of the ship and cargo, in-

ALBANY,
Feb. 1811.

MUMFORD
v.
PH. Ins. Co.

eluding what was landed and under the custom-house keys, to be good and lawful, under the 8th article of the decree of the 21st *November*, 1806, and confiscating the ship and cargo for the benefit of the government, to be disposed of pursuant to that decree. The reasons set forth in the decree were, that the captain, on the 2d of *September*, 1807, affirmed, that he had not been in *England*, when by his log-book and his own declaration, it appeared that he had been in *England;* that none of the excuses for the false declaration, offered by the captain, as that he was intoxicated at the time, or did not understand the language of the writing he signed, which was in *French* and *English*, could be admitted.

The captain of the *Victory* was examined as a witness at the trial. He testified that none of the crew left the *Victory* while in the road of *Plymouth*, that he was ordered on board of the *English* gun brig, but never went ashore, nor was any thing taken on board, except the certificate of the *American* consul. On his arrival at the *Cherbourg* roads, where he came to anchor; a boat from the custom-house, and one belonging to the police, came on board, by whom he was examined, and to whom he communicated fully the circumstance of his having been compelled to go into the road of *Plymouth;* that the officers of the boats examined the ship's papers and log-book. The pilot then directed him to go on board the frigate *Stationaire*, before he could go up to the town, and he accordingly went on board the frigate, where a conversation took place between him and the commander, but as he was ignorant of the *French* language, and there was no interpreter present, he understood very little of what was said. That he heard no question as to having been in *England*, or having been visited by the *British;* that he signed a paper written in the *French* language, on board of the frigate, which was not translated or explained to him ; but was represented to be a paper which it was necessary for him to sign,

before the ship could be permitted to go up to the town; that the ship's papers and log-book were taken from him by the *French* officer, and were not returned to him again; that no paper or decree in *French* and *English* was shown to him, and that he signed no declaration nor made any acknowledgement that he had been on shore in *England;* that he did not tear the certificate of the *American* consul, but standing on deck, while the officers were examining the log-book, he had occasion to take some money out of his pocket, and took out, at the same time, the certificate, which he had carried in his pocket, as a paper of no importance, and which was much worn, and on being asked by the officer what it was, he said it was a paper of no consequence, but the officer appearing desirous to have it, he gave it to the broker; and that he made no such answers as are stated in the *procès verbal.*

A deposition of a witness taken in *Cherbourg*, under a commission, was read in evidence, which stated that the captain of the *Victory* signed a paper on board of the *Stationaire*, or guard-ship, in the road of *Cherbourg*, declaring that the *Victory* did not come directly from *England* or an *English* colony; that the paper was in the *French* language, and was signed by the captain without any previous interpretation; and the officer of the guard-ship observed, that it was a formality merely to announce the arrival of the *Victory*, and the nature of her cargo; that if the usual interrogatories had been put, and properly interpreted to the captain of the *Victory*, the witness believed the captain would have mentioned his having been compelled to go to *Plymouth*, and that on such information he would have been ordered, according to the instructions of the government, at that time, to return to sea; but that the *Victory* not having been ordered to sea, in consequence of the misunderstanding which took place on board the *guard-ship*, and having once entered the port of *Cherbourg*, became liable to be confisca-

ted, under the decree of the 21st of *November,* 1806, and that no means used by the captain, consignee, or any person, could save her or her cargo; that the *potashes* and *fustic* were at no time at the disposal of the consignees, but the seizure was commenced before the landing of the goods, and never removed; the goods having been permitted to be landed only on giving security to the custom-house, to have them forthcoming, or to pay the value thereof, and to submit to the decision of the government respecting them.

ALBANY,
Feb. 1811.

MUMFORD
v.
PH. t·ɛ ꞏo.

Soon after the sentence of condemnation, the *potashes* and *fustic* were sold at public auction, under the direction of the officers of the government, and the proceeds thereof were received and kept by the government or its agents.

*S. Jones,* jun. for the plaintiff. The plaintiff having proved his interest, that the property was *American,* and that it was seized before it was landed, and afterwards condemned, is, on general principles, entitled to recover. Is there any thing in the reasons assigned by the *French* court for the condemnation, which can defeat or prevent his recovery?

The consular certificate alleged to have been destroyed was a paper of no consequence. It is impossible that the captain would have intended any thing improper in regard to that paper, or have supposed that it could affect him. His account of it is natural, and undoubtedly true. He positively denies the entry in the log-book, as stated in the *procès verbal;* his papers having been taken from him and detained, he had no means of explanation, and we must rely on his deposition. Can it, for a moment, be believed that the master could have understood the purport of the declaration signed by him that he had not been in *England?* But admitting that he knowingly signed it, and that it was false, is it such a false declaration, as by the law of

nations would be a cause of condemnation? If it is not a sufficient cause of condemnation, under the law of nations, neither can it be under the *Berlin* decree. It is not requisite to inquire whether this decree is a municipal regulation or not. Admitting that *France* had a right to prohibit neutral vessels which had touched in *England*, or been boarded by *English* cruisers, from entering her ports; yet she could have a right only to turn away such vessels from her ports, not to seize and condemn them for that cause. Such a seizure and condemnation would be a flagrant act of hostility. In *Mayne* v. *Wal-* *ter*,* where a ship was warranted *Portuguese*, and was condemned by the *French* court because she had an *English* supercargo on board, Lord *Mansfield* said, it was an arbitrary, oppressive regulation, contrary to the law of nations, and the insured were entitled to recover. After being released by the *British* cruiser, the master could not avoid proceeding to his port of destination; for, according to the decision in *Craig* v. *The United Insurance Company*,† the fear of seizure under the *Berlin* decree would not have justified an abandonment of the voyage. Besides, the master had every reason to believe, from the declaration of the *American* minister at *Paris*, that the *Berlin* decree would not be enforced against *American* vessels. The vessel was, in fact, permitted to enter *Cherbourg*. The subsequent seizure and condemnation was arbitrary and unjust, and without any fault of the master. Again, if the master did knowingly make a *false* declaration, it was *barratry*; being a fraudulent act done to the injury of the owners.‡

*Park,263. 474.

† 6 Johns. Rep. 226.

‡ 2 Stra. 1173. 6 Term Rep. 379. 8 East,126. Park, 114. 124.

*T. A. Emmet*, contra. The point as to *barratry* must be dismissed; for there is no count in the declaration for barratry. The opinion of Lord *Ellenborough*, in *Earle* v. *Rowcroft*, subverts all distinction between barratry and the faults of the master. It is an essential in-

gredient in an act of *barratry*, that it is done by the master for his own benefit.*

ALBANY,
Feb. 1811.

MUMFORD
v.
PH. INS. Co.

* *Park*, 111.

[*Jones.* It was agreed by the attorneys, that any special counts which the plaintiff thought necessary, should be added to the declaration.]

The act of the master was either a violation of the law of nations, or of a municipal regulation of the government of *France.* This is not *barratry.* It does not appear that the conduct was *ex maleficio*, or for his own benefit.

I contend that the goods were *safely landed*, within the terms of the policy. The vessel arrived at her port of destination. The consignees came forward and petitioned to have the cargo landed; and it was landed in consequence of their request. Notwithstanding the provisional seizure, the goods were not, in fact, sequestered, until a fortnight after they had been landed at the request of the consignees. The words in the policy, "until the said goods shall be safely landed," could never be intended to apply to the goods, after they had once touched the land. Suppose they had been consumed by fire, six months after they had been put into the custom-house stores, would the insurers have been liable? Are they to continue answerable for an indefinite time? Is *sea* risk to be converted into *land* risk? The consignees having exercised acts of ownership, and procured the landing of the goods, the policy was at an end, and the defendants discharged.

Again, here was a seizure and condemnation for an illicit and prohibited trade. It is true that the *Milan* and *Aranjuez* decrees were hostile and belligerent. But *France* did not commence her system by an open hostile act. The *Berlin* decree is not of that character.

The 7th article merely declares that " no vessel coming directly from *England* or her colonies, or having been there since the publication of the decree, should be admitted into any port." And the 8th article declares, " that every vessel, that, by a false declaration, contravenes the 7th article, shall be seized, and the ship and cargo confiscated, as if *English* property." It is not liable to confiscation *as English* property, but · as *if* it were *English* property.

It may be said that as the *council of prizes* adjudicated upon this seizure, it was hostile ; but as the decree gives jurisdiction to that court, as if it were *English* property, they were bound to decide on the case. This decree is a mere municipal regulation. It does not affect the flag or neutrality of other nations. It does not extend to the high seas. It merely affects vessels coming into the ports of *France*. It is, therefore, a mere prohibition to trade, and is distinguishable from the *Milan* and *Aranjuez* decrees. The sentence of the court declares the seizure good and lawful under the decree, but does not contain the word *prize*, or any language indicating a hostile seizure. The case of *Johnston & Weir* v. *Ludlow**\* will, probably, be cited to show that to constitute a breach of the warranty, there must be an illicit and prohibited trade, in fact ; and that it is not sufficient to show a condemnation, under pretext of an illicit trade. I admit that this decision is confirmed by the case of *Graham* v. *The Pennsylvania Insurance Company*, in the circuit court of the *United States* for the district of *Pennsylvania.†* But the words " for or on account of," must mean something more than a seizure for an illicit trade, in fact. From the evidence in the case, it must be taken as a fact that the captain did make a false declaration, in consequence of which the trading at *Cherbourg* became illicit. The fact having happened, by which the trade under the *Berlin* decree became illicit, and so declared by the council of prizes,

* *2 Johns. Cas.*
*481.*

† *Condy's* ed. of *Marshall*, 346, s. 347. in note.

will this court say there was no illicit trade? The facts, according to the *procès verbal*, were proved by four witnesses; and are they now to be contradicted or explained by the testimony of the captain? If, then, this was a prohibited trade, and the seizure was for that cause, the defendants are discharged.

*Hoffman,* in reply. The goods were never safely landed. When the captain went to the custom-house to make his entry, he declared truly that he had been carried into *Plymouth;* and in consequence of this declaration there was a *provisional seizure* of the vessel and cargo. The case states, that at no time were the goods under the dominion of the consignees.

Whether the captain did make a false declaration, or not, is open to examination here; and the fact is positively denied by him. His deposition fully explains the transaction, and shows, most satisfactorily, that he never made such a declaration. But even admitting that he did make a false declaration on board of the guardship, he did not falsify the warranty of neutrality, nor the warranty as to illicit or prohibited trade. The provisional seizure was not made on account of his false declaration at the mouth of the river, but on account of his true declaration at the custom-house. Before the 4th *September* the *Berlin* decree had never been enforced against the *Americans.* This ship was the first victim.

But it is said that the *Berlin* decree is a mere municipal regulation. The *preamble* shows its true character. It is hostile to *Great Britain,* and to the gratification of that hostility, it sacrifices all neutral rights. There is no distinction between this and the *Milan* decree. Both are dictated by the same spirit, and form part of the same system. The principles of both are the same. The latter is only more explicit and extensive than the

ALBANY,
Feb. 1811.

MUMFORD
v.
PH. INS. CO.

former. A condemnation as if it were *English* property, is the same as a condemnation as enemy's property. The case of *Craig* v. *The United Insurance Company* admits that a seizure under the *Milan* decree would be within the policy. It is for the court to decide whether the *Berlin* decree does not violate neutral rights. If it does, it ceases to be a mere municipal regulation. The question is substantially decided in the

* 3 *Johns. Rep.* case of *Speyer* v. *The New-York Insurance Company.**
88.

But if the *Berlin* decree was a mere municipal regulation, the act of the master must be *barratry*. For it is settled, that if the master knowingly violates the laws of the country to which the vessel is destined, in consequence of which she is seized, it is an act of barratry.

KENT, Ch. J. That question was discussed in the
† 2 *Caines*, 223. case of *Strickley* v. *Delafield*.†
and see *Kend-rick* v. *Delafield*.
2 *Caines*, 67.

*Per Curiam.* The seizure in this case was not on account of the fact of the ship having come from *England*. That fact would only have caused the vessel to be sent away. She was seized and condemned with her cargo, on the single ground of a false declaration of the captain, made on board the *Stationaire*, that he had not been to *England*. This appears from the proceedings in the *French* admiralty, and it was, therefore, not a loss "for or on account of any illicit or prohibited trade." The avowed cause of the seizure and loss, being a fraud in the master, distinguishes this case from that of *Speyer* v. *New-York Insurance Company*, (3 *Johns. Rep.* 88.) to which it would otherwise have been very analogous. The ground of condemnation was proved, upon the trial of this cause, to be untrue and unjust, and it was a charge exceedingly improbable in itself, considering the circumstances at the time. But we have

nothing to do here with the pretexts for the condemna-
tion, so long as the loss was not for any illicit or pro-
hibited trade. The loss came under the general pe-
ril of "arrests and detention of princes." Going to
*Cherbourg*, after having touched at *Plymouth*, was going
to a prohibited port; under the 7th article of the *Berlin*
decree; but the mere entry into that port was not a
breach of warranty. If there had been no seizure, and
the ship had taken fire and been burnt in the harbour,
before the goods were landed, the insurer would un-
doubtedly have been liable. Seizure for trading or at-
tempting to trade at *Cherbourg*, contrary to the *Berlin*
decree, would have brought the case within the reach
of the warranty. The seizure and condemnation in
this case were not made upon that ground; but on
the ground of an alleged imposition by the captain; and
if it be established by the case that the loss did not
arise from seizure for a prohibited trade, but from sei-
zure for another cause, the insurer is responsible for
the loss.

Judgment for the plaintiff.